UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA <br><br> v. <br><br> TANGTANG ZHAO | No. 21 CR 505 <br><br> Judge Manish S. Shah |

**THE UNITED STATES' OPPOSITION TO DEFENDANT'S
MOTION FOR JUDGMENT OF ACQUITTAL OR NEW TRIAL**

On June 23, 2023, a jury in the Northern District of Illinois found Defendant Tangtang Zhao ("Defendant" or "Zhao") guilty of 12 counts of theft of government property, each in violation of 18 U.S.C. § 641. Dkt. 72. On May 14, 2023, Defendant filed the instant motion, first claiming that the Court improperly denied his motion for judgment of acquittal at trial. *Id.* at 2. Alternatively, Defendant seeks a new trial under Federal Rule of Criminal Procedure 33, in the interest of justice. *Id.* Because the evidence at trial overwhelmingly supported Defendant's conviction and no trial errors occurred, the Court should deny Defendant's motion.

**I.       RELEVANT LEGAL STANDARDS**

Defendant cites Rule 29 and Rule 33 as separate avenues for relief, and then presents a single argument in support of both. As such, the government's response follows a similar course; instead of addressing individual issues raised by Defendant in the context of either Rule 29 or Rule 33, the government lays out the legal standard for both forms of relief, followed by a single argument addressing Defendant's points, and why they are insufficient for either acquittal or a new trial.

### A.  RULE 29 JUDGMENT FOR ACQUITTAL

In a Rule 29 motion for acquittal, defendants "bear[] a heavy, indeed, nearly insurmountable burden." *See United States v. Schlyer*, No. 17 CR 30, 2018 WL 620057, at *1 (N.D. Ill. Jan. 30, 2018) (collecting cases). A court will "only overturn the jury's verdict if 'after viewing the evidence in the light most favorable to the Government, the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Taylor*, No. 17 CR 658, 2019 WL 4410279, at *1 (N.D. Ill. Sept. 16, 2019). A defendant must show "the record contains no evidence, regardless of how it is weighed, from which a jury could have returned a conviction." *Schlyer*, 2018 WL 620057 at *1 (internal quotation omitted).

### B.  RULE 33 MOTION FOR A NEW TRAIL

Alternatively, Rule 33 permits a district court to "vacate any judgment and grant a new trial if the interest of justice so requires." *United States v. Hamdan*, 910 F.3d 351, 357 (7th Cir. 2018). But the "[e]xercise of power conferred by Rule 33 is reserved for only the most extreme cases." *Id.* "[A] jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly." *United States v. Betts-Gaston*, 142 F. Supp. 3d 716, 730 (N.D. Ill. 2015). Courts evaluate the trial record "to determine 'whether the verdict is against the manifest weight of the evidence'" and "should grant a new trial only if the evidence 'preponderates heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand. *Taylor*, 2019 WL 4410279 at *1.

## II. ARGUMENT

### A. THE VACCINATION RECORDS CARDS WERE GOVERNMENT PROPERTY

Defendant's primary argument is that the government failed to establish that the COVID vaccination record cards ("COVID cards") Defendant sold were government property. Dkt. 76 at 4-9. First, Defendant attempts to hold the government to a higher standard than the law requires by conflating evidence showing "sufficient supervision and control" with explicit references to "government property." Next, the evidence at trial unequivocally established that the government maintained sufficient supervision and control over the COVID cards, and the jury properly found that such cards were government property.

Defendant repeatedly relies on the fact that certain evidence presented at trial did not expressly state that the COVID cards were government property. He points out that the Provider Agreement between Centers for Disease Control and Prevention ("CDC") and Walgreens ("the Agreement") "was not clear that the [COVID cards] were Government Property[,]" and that CDC witness Michelle Banks "admitted that there is nothing in the provider agreement that states that the [COVID cards] were Government Property." Dkt. 76 at 4, 5. He argues that Government Exhibit ("GX") 109, a supplement to the Agreement, "demonstrates that the Government knew how to specifically state ancillary kit supplies were Government Property as soon as January 20, 2022," and because the same language was not used regarding COVID cards, the cards were "not considered Government Property by the CDC." Id. at 6-7.

3

The Court should not accept this attempt to hold the government to a standard that far exceeds what is required by law. The prosecution was required to prove at trial that the government maintained "sufficient supervision and control" over the COVID cards to establish that they were government property. Dkt. 70 at 19; *see United States v. Scott*, 784 F.2d 787, 791 (7th Cir. 1986) ("the key factor is whether the federal government still maintained supervision and control over the [property]"); *see also United States v. Howard*, 30 F.3d 871, 876 (7th Cir. 1994) (element satisfied "[i]f the federal government maintains sufficient supervision and control over the property[.]"). Determining whether property constitutes government property is a fact-specific inquiry, and while the Seventh Circuit has outlined factors for courts to consider in this analysis, none of these factors require explicit "government property" labels to meet the "sufficient supervision and control" standard. *See Scott*, 784 F.2d at 791 (considerations include "[e]vidence that the federal government monitors and audits programs, regulates expenditures, and has the right to demand repayment of funds"; *United States v. Wheadon*, 794 F.2d 1277, 1285 (7th Cir. 1986) ("reversionary interest in the payments [is] one component of the 'adequate' evidence presented by the government in that case. The key factor remained whether the government maintained supervision and control."). While the jury can and should consider whether the CDC explicitly stated the cards were government property (which it did do, as will be discussed *infra*), there is no legal requirement for the CDC to do so for the jury to find the cards were, in fact, government property.

4

Further, Defendant mischaracterizes the government's rebuttal argument, and makes an out-of-context assertion that the single use of the term "probably" diminished the government's burden of proof. Dkt. 76 at 6. While Defendant claims that the use of this term applied generally to "whether the blank [COVID cards] were clearly Government Property during the time of Zhao's charges in March and April of 2021," *id*. at 5, the term "probably" was used in a more limited scope, in particular reference to an amendment the CDC made to the Agreement. As Ms. Banks explained, the original Agreement included a link to a page of the CDC website, and as part of the Agreement, Walgreens stipulated that it would monitor this page to learn of, and adhere to, evolving CDC guidance. Tr. at 288-89. The CDC published additional guidance to this page on February 25, 2021, setting forth the following:

> At this time, all COVID-19 vaccine in the United States has been purchased by the United States Government for administration exclusively through the CDC COVID-19 Vaccination Program. The vaccine remains U.S. government property until administered to the recipient. COVID-19 vaccination providers are prohibited from selling USG-purchased COVID-19 vaccine (and ancillary materials purchased by the USG for use in the Vaccination Program)[.]

GX 108 at 2. However, as Ms. Banks testified, after receiving reports of COVID cards being sold, stolen, and shared, the CDC sought to clarify that the cards themselves were also government property, and had been so since the inception of the Vaccination Program. Tr. at 332-33. So, the CDC issued an amendment to the Agreement, dated June 11, 2021, establishing such clarification:

5

> At this time, all COVID-19 vaccine in the United States has been purchased by the United States Government for administration exclusively through the CDC COVID-19 Vaccination Program. The vaccine and *all related ancillary supplies, including the COVID-19 Vaccination Cards,* remains U.S. government property until administered to the recipient. Inherent in the reference to COVID-19 vaccine remaining property of the United States Government, all USG-furnished ancillary materials, *including COVID-19 Vaccination Record Cards, have remained property of the United States Government for exclusive use in the CDC COVID-19 Vaccination Program since the program's inception.*

GX 109 at 6 (emphasis added). This clarification to the Agreement is what the government referenced in its rebuttal, when it argued that the initial CDC guidance from February 2021 was likely clear enough to establish that the CDC considered ancillary supplies (including COVID cards) government property. But, if that was not clear in the February 2021 guidance, it was unequivocal in the June 2021 guidance.

Notwithstanding the fact that the CDC perceived COVID cards as government property, that is not determinative of whether the cards were *actually* government property under the law; the government never suggested as much in its argument. To make that finding the jury was instructed to consider not how the CDC *perceived* the cards, but rather, how it treated the cards; in particular, whether it maintained "sufficient supervision and control" over the cards." Dkt. 70 at 19. The trial record is replete with evidence supporting this proposition, and the jury's finding that the government proved this element was correct and well-grounded.

First, the Agreement laid out explicit rules about how Walgreens must use the COVID cards after they were in Walgreens' possession. In particular, the Agreement

6

stipulated that Walgreens could not "sell or seek reimbursement for COVID-19 Vaccine and adjuvant, syringes, needles, or other constituent products and ancillary supplies that the federal government provided at no cost to [Walgreens]." GX 104 at 3. As Ms. Banks testified, "ancillary supplies" included COVID cards. Tr. 275-76.

In addition to requiring Walgreens to agree not to sell COVID cards, the Agreement also made clear that Walgreens could not issue blank or incomplete cards, and it specified the individuals to whom Walgreens could issue the cards. It required that Walgreens "must provide a completed COVID-19 vaccination record card to every COVID-19 Vaccine recipient, the adult caregiver accompanying the recipient (if applicable), or other legal representative (if applicable)." GX 104 at 5. Further, by virtue of mandating that the card be issued to the vaccine "recipient" or some representative thereof, the Agreement also made clear that Walgreens could only issue the card after the vaccine is administered, and not before.

The government's control over the cards existed in these Agreement rules. If Walgreens did not follow the rules as set forth in the Agreement, it could not be a part of the CDC COVID Vaccination Program ("the Program"). Tr. at 283. Indeed, other providers had been terminated from the Program on that basis. *Id*. Walgreens handled the cards in accordance with the terms of the Agreement, Tr. at 494, 497-98, 513, and it understood the consequence of violating those terms. As David Stauffer, Senior Director of Specialty Pharmacy Operations, testified, a violation of those terms meant "we would lose our ability to administer COVID-19 vaccine." Tr. at 494.

7

Walgreens itself understood the COVID cards to be government property. Stauffer testified that, in the event individual pharmacies ran out of CDC-issued COVID cards, they could use another version of the card provided by Walgreens, which had a Walgreens logo instead of a CDC logo. Tr. at 499-500. *See also* GX 301-A. Walgreens created its own backup card instead of simply reproducing the CDC card, in part, because it understood the CDC cards were not property of Walgreens, even after they were in the possession of Walgreens. Tr. at 518.

In addition to the control the CDC exercised over the COVID cards, it also maintained supervision over the cards through "quality assurance oversight visits" to provider locations. Tr. at 307-08. The objective of these visits was for the CDC to evaluate the providers' vaccine administration operations and determine whether there were "areas of noncompliance and areas that [the providers] need to improve in." Tr. at 309. CDC personnel would make this evaluation and generate a written report for the provider. *Id.* In addition to process deficiencies, the written report would also address topics that were tailored to the needs of the particular provider, such as how to handle a surplus of COVID cards. Tr. at 307-09.

In summary, the government presented overwhelming evidence that the CDC exercised significant supervision and control over the COVID cards, even after they transferred to Walgreens. The jury's finding that the government met its burden of establishing that the cards were government property was correct, and the Court should deny his requests for relief under Rule 29 and Rule 33.

8

### B.  ALL JURY INSTRUCTIONS WERE PROPER

Next, Defendant takes issue with certain jury instructions issued by the Court, claiming the term "sufficient supervision and control," was impermissibly vague (Dkt. 76. at 3); that the Court improperly misled the jury regarding stolen property (*id.* at 10); and that the "aggregate value" instruction was vaguely worded and caused confusion (*id.* at 12). The Court should reject these arguments.

The Supreme Court has held that "[i]n a criminal trial, the state must prove every element of the offense, and a jury instruction violates due process if it fails to give effect to that requirement." *Middleton v. McNeil*, 541 U.S. 433, 437 (2004). However, "not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." *Id*. Rather, the instruction must have been so woefully inadequate that it tainted the entire trial. *Id.* (citing *Estelle v. McGuire*, 502 U.S. 62, 72 (1991)). Finally, the burden on Defendant is heavy—he must show a "'reasonable likelihood' that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt." *Waddington v. Sarausad*, 555 U.S. 179, 191 (2009) (quoting *Estelle*, 502 U.S. at 72). Defendant is unable to meet this burden, and his arguments thus fail.

#### 1.  Government Property Instruction

First, the instruction defining government property was not impermissibly vague. The instruction was crafted after, as Defendant concedes, "much discussion between the parties." *Id.* at 2. The Court settled on a version of the instruction

9

"largely proposed by the defense[,]" and sought Defendant's opinion as to how the Court should handle a potential jury question regarding the degree of sufficiency required. Tr. at 709. When the Court suggested it would let the jury make that determination, Defendant, through counsel, agreed that was the proper course. *Id.*

Further, while Defendant argues that "[t]he phrase 'sufficient supervision and control' has been defined in the context of 18 U.S.C. § 641[,]" he fails to cite any case in this Circuit that has done so. Dkt. 76 at 3-4. His reliance on the Miriam-Webster Dictionary definition of "sufficient" (*id.* at n.1) supports the notion that the jury was well equipped to make such a determination. Indeed, the definition "enough to meet the needs of a situation" (*id.*) is the uncomplicated and customary meaning of the word that would have been the appropriate context for jury deliberations.

### 2. Purportedly "Misleading" Instructions

Defendant's next claim, that the Court's instructions improperly misled the jury, also falls flat. Defendant wrongly claims that the instructions "conclude that a theft of the [COVID cards] occurred," Dkt. 76 at 10, and thus the jury did not have the freedom to make any other finding. However, as the Supreme Court has held, it is a "well-established proposition that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Boyde v. California*, 494 U.S. 370, 378 (1990) (citing *Boyd v. United States*, 271 U.S. 104, 107 (1926)). Defendant cannot selectively attack certain instructions, while asking the Court to ignore other instructions and the evidence at trial.

While Defendant claims the instructions "conclude that a theft…occurred," Dkt. 76 at 10, this is belied by the very language of one of the instructions Defendant challenges. In particular, Defendant cites the following instruction: "If you find that Defendant was in possession of property that recently had been stolen, you may infer that he knew it was stolen. You are not required to make this inference. . . . " Dkt. 70 at 20. The use of the term "if" clearly implies an uncertain possibility; it signals to the jury that it might find the COVID cards had recently been stolen, or it might not.[1]

Further, under *Boyde*, the instruction must be analyzed in the context of the other instructions, including the following:

> In order for you to find the Defendant guilty of this charge, the government must prove the following elements beyond a reasonable doubt: . . .
>     3. The Defendant stole, or knowingly converted to his own use, or, without authority, sold or conveyed that thing of value; . . .
>     If . . . you find from your consideration of all the evidence that the government has failed to prove any one of these elements beyond a reasonable doubt as to the charge you are considering, then you should find the Defendant not guilty of that charge.

Dkt. 70 at 16. This instruction—perhaps the most important the Court provided, given that it lays out what is required for a guilty verdict—makes clear that that the Court did not "conclude that a theft of [COVID cards] occurred[,]" as argued by Defendant. Dkt. 76 at 10. Rather, the Court property left that issue to the jury.

---

[1] To the extent Defendant argues that "if" relates to whether Defendant possessed the property at all, that issue was not challenged at trial. *See, e.g.*, Tr. at 825-26 (defense counsel closing argument: "You may not like what Mr. Zhao did, and you might disagree with his actions, but that is not proof beyond a reasonable doubt.")

11

### 3. Aggregate Value Instruction

Finally, Defendant's argument that the aggregate value instruction was vaguely worded and confusing also fails. First, the instruction was crafted with significant participation from both parties. *See* Tr. at 691-92, 697-702, 717-22. While Defendant now claims that an interrogatory verdict form would have added "clarity," Dkt. 76 at 13, such a form is not required. The Seventh Circuit simply requires that, when a defendant faces multiple charges and there is dispute over whether the aggregate value exceeds $1,000, "the jury should be given an appropriate instruction." 7th Cir. Pattern Instructions, 18 U.S.C. § 641, Committee Comment.

This Court adhered to the Committee Comment guidance in issuing the following instruction:

> With respect to the element requiring proof that the thing of value had a value that exceeded $1,000, the government must prove beyond a reasonable doubt that the aggregate value of the government property, combining amounts from all the counts for which the government has proven the other elements of the offense, is more than $1,000.

Dkt. 70 at 18. While this language on its own sufficient to instruct the jury as to the principle of aggregate value, the Court made that guidance even more unambiguous by adding the following language:

> If after your consideration of all the evidence you find that the government has failed to prove beyond a reasonable doubt that the aggregate value of the government property, combining the value from all counts of conviction, is more than $1,000, then you should find the Defendant not guilty.

*Id*.

12

In summary, all the Court's instructions accurately stated the law and were not vague. They certainly did not raise a "reasonable likelihood" that the jury applied instructions in a way that relieved the government of its burden of proof, as required under *Waddington*. 555 U.S. at 191. The Court should reject Defendant's arguments.

### C. THIS COURT DID NOT ABUSE ITS DISCRETION

Finally, Defendant points to a variety of rulings made prior to and during trial, claiming these rulings were abuses of the Court's discretion. These arguments similarly fail. Each of these purported abuses of discretion are addressed below.

First, Defendant's claim that government witnesses Brian Hall and Andrew Proctor offered "expert opinions" is not correct. These fact witnesses offered testimony regarding the acquisition contract that existed between the Department of Health and Human Services and McKesson for the COVID cards. Under the contract, there was no question the property belonged to the U.S. government. *See* Tr. at 346-47, 348, 374, 387-88, 390. As this Court made clear, "opinion" testimony as to whether something constitutes government property is altogether different than testimony which is "factually within the zone of a witness' personal knowledge of items being government property[,] which can be a function of their experience in procurement processes[.]") Tr. at 393. This logic applies, the Court explained, to

> a private sector person who is tasked with providing property to the government[,] who then may develop an understanding and familiarity with the idea that, "When we subcontract something out with a contract with the government and then are paid by the government to give that item to the government, our understanding is that that's government property because that's the nature of our relationship."

13

*Id.* at 393-94. The testimony at issue was fact testimony that required neither an expert notice, nor a special jury instruction.

Next, the Court did not abuse its discretion by allowing evidence of non-charged sales listings under Rule 404(b). *Id.* at 11. As the Court reasoned, evidence

> of repeated representations that the cards the defendant is selling are authentic, genuine; that he understands his listings get taken down, but he sells anyway, that's all relevant to show the defendant's knowledge that the cards are not his property, that he doesn't have the authority to sell them, and that he intended to deprive the true owner of the cards of its right to use the cards. And there's no propensity inference in that chain of reasoning.

PTC Tr. at 24. The Court allowed the evidence adhering to Rule 404, as well as Circuit precedent under *United States v. Gomez*, 763 F.3d 845 (7th Cir. 2014).

Next, the Court did not abuse its discretion by allowing evidence of an eBay message from a purported Washington Post reporter. Dkt. 76 at 11-12. The fact that, upon that message being sent, Defendant drastically changed his behavior—including by ceasing to sell COVID cards and making the false assertion to potential buyers that his eBay account had been compromised, as well as the direction to potential buyers to destroy cards they may have purchased from him in the past (*see* GXs 407, 804; Tr. at 673)—is strong circumstantial evidence that Defendant did receive the message and took immediate action to conceal his criminal conduct.

Finally, the Court did not abuse its discretion in allowing evidence of "chats related to the charged sales[;]" allowing the testimony of Bijan Salehizadeh; or allowing evidence of an eBay policy prohibiting the sale of government property, as

14

claimed by Defendant. Dkt. 76 at 11-12. While Defendant offers no further argument beyond his abuse of discretion assertions, this was all fair evidence of the charged offenses. In particular, chats Defendant had with buyers in the charged sales corroborate that the sales in the Indictment occurred. Testimony from Salehizadeh (particularly Defendant's advertising of COVID cards as "pouches") demonstrated Defendant's attempts to conceal his conduct, and thus his guilty conscience. Evidence of the eBay policy prohibiting the sale of government property was probative of Defendant's state of mind, including knowledge that the property was not his, and his intent to deprive the owner. All of this evidence was entirely appropriate for jury consideration, and the Court did not abuse its discretion in allowing it.

For the reasons stated herein, the government respectfully requests that the Court deny Defendant's motion.

Respectfully submitted,

Dated: August 25, 2023         GLENN S. LEON
Chief, Fraud Section
Criminal Division, U.S. Department of Justice

By:    */s Victor B. Yanz*
Victor B. Yanz
Claire T. Sobczak
Trial Attorneys
U.S. Department of Justice
Criminal Division, Fraud Section
219 South Dearborn St., Rm. 500
Chicago, Illinois 60604
Email: victor.yanz2@usdoj.gov
(202) 957-2993